Justice of the Ninth Circuit, my name is Michael Flanagan and I'm here representing Dianne LeSuer, who is an appellant in an ERISA disability, long-term disability claim. And in this particular case, the appeal concerns two main issues, which is, first of all, standard of review, and this court decides that issue de novo, that is, you decide de novo whether or not the district court got it right as to the standard of review. The standard of review the district court found in this case was an abuse of discretion standard. However, we had Isn't that the standard that is established under the Abbatee case, where the discretion is entirely within the claim process? Well, sometimes yes and sometimes no. Under Firestone, they have to have the right words in the plan, and that's been, a body talks about that. And we argued that in front of the U.S. District Court. However, our main thrust in the appeal was that the standard of review can be changed from abuse of discretion to de novo if there are flagrant abuses in the claims process, that's in a body. And the flagrant, one of the examples given in the body was a time period for making a decision that was far outside the bounds of what was required either under the Act, which is 90 days, 245-day periods are allowed, or under the plan. Here we had But the delay issue was something that you consider in the process of reviewing the claim. Well, you can do that too. But Abbatee said that if there are flagrant abuses of the procedural rules, that the court could adopt a de novo, and the example they gave in Abbatee was for the flagrant violation was a long delay. And here we have 14 months instead of 90 days, a delay between the original denial, well there was original denial, my client appealed, and then there was 14 months between that appeal and a final denial of appeal. So I'm just using the examples given in Abbatee, and under that case that says that's a flagrant violation. So if that's correct, that's a correct reading of Abbatee, the district court should have given a de novo review. Now that's just argument one. Argument two was that even if the court had a abusive discretion standard, then under Abbatee, and Safon, and Montour, those are following cases, the court views with skepticism decisions of a conflicted claims administrator when there are irregularities, shall we say, in the claims process. And there are plenty of irregularities in this claims process. First of all, they are conflicted in this case. This is an insured plan. They had administrators that they hired for the plan, but these are basically contract administrators who are under the same, we would argue, under the same financial pressures that an employee of the insurance company would be under. Plus, as we said in our opening brief, under the agreement between Aetna and first IDR, which was the first administrator, which agreement was not changed for the second administrator DIS, Aetna reserved the right to review and be involved in or approve of any approval or denial of claims. So they basically kept their hands on the thing by contract. So then, so they are definitely conflicted claims administrators. So then, what do we have in here? Well, when she supplies, and this is a cleaning lady at a hospital. This is not a sophisticated person. This is just a layperson with poor education and learning disabilities. And she submits her documents, which consist of some medical records, and they come back and say, well, we're denying it because we did an internal review. But they don't give her the internal review. Turns out that internal review wasn't by a doctor. It was an unlicensed care manager who said in her own report, I'm not doing, this is not a disability determination. That's up to the claims manager, and then goes on to basically go through a summary of the medical records and say, well, there's not enough evidence to prove disability. Well, what was the evidence? Well, the evidence was that this lady had had a serious automobile accident in years previous. I think it was 1990, and then she had another on-the-job injury in 99, which appeared to aggravate that condition. She went to her first doctor, Dr. Smith. He gave her the standard conservative treatment, take care of yourself, you know. And then we see in her employment records between that time, which is I think around June of 99 through December, she's taken tons of time off. She's taken leave time. She's taken medical leave. She's taken vacation time. She's taken lots and lots of time off. Then when things don't get better, she goes to see Dr. Wells. And Dr. Wells says, gee, I think you've got a problem here. I'm going to put you off work for a few weeks, and then I'm going to send you in for an MRI. She gets an MRI. It shows degenerative disc disease, and it shows bulging discs, and it shows medial tears, which are tears in the discs. And so that's objective evidence to support her claim. And... Well, is it objective evidence of total disability? Well, no, I said to support her claim. Now, I'll get to the disability part in just a second. So he says, I'm going to put you on restricted duty. No more lifting more than 20 pounds. And then what her employer tells her, the hospital says, well, you can't come back to work if you can only lift 20 pounds. Now, that's conclusive proof of... How old is she? She was 47, I think, at the time. It's in the brief. I can find that for you if it's real important. In fact, it's right in the beginning of the brief, actually, at the front page. 46. Okay, there you go. Thank you. So, anyway, so he said, you can't come back to work. So then she sees a Dr. Bardman, Dr. Bardman, so this is when she's already off work. And she and Dr. Wells and Dr. Smith all found range of motion limitations. All three of her treating physicians found range of motion and diagnosed chronic pain. And, by the way, there isn't any objective evidence for chronic pain. It's a subjective symptom, and this court has said in, I think, Safon and Montour, you can't blame somebody for not being able to have a pictogram or something that says this is what my pain is. This proves I'm in pain. So, anyway, that was the evidence at that time, and she was turned on based on this internal review, not given a copy of it, not told, look, what you may not understand this process, but what you need is you need to get a more detailed opinion or you need to get this kind of an x-ray or whatever they are. Now, what is your strongest legal argument here? Well, the strongest legal argument that I was going to get to was that, additionally, she went and saw on base Ammendorf doctors, Dr. Wassily, and she saw Major Smith, who's the PT person out there, they both said she's totally disabled. And the claims administrators totally ignored those opinions, and their basis was, well, those opinions were later in time. But Dr. Smith, their records said, I've been treating her since 1998, which was before the claim, and the other doctor, Dr. Wassily, said that she was disabled all the way back to the time Dr. Wells put her on restricted. These were not considered by the claims administrator because they were submitted in her appeal, and in the appeal, the claims administrator hired Dr. Amato to look at it. They didn't give her those records. They decided, oh, you don't need to see those records, so they never gave it to them. The best evidence she had, they didn't even give to a medical reviewer. Now, I would say that's not a fair and full claims evaluation, as they're supposed to do. And, and so. That the Ammendorf doctors' findings were never presented to the claims manager? No, they were, my client gave them to him in her appeal. Right. And she also gave the Social Security Administration determination she was totally disabled. They decided on their own to not give that to their medical reviewer, Dr. Amato. It's not, it's never referenced, he references all the records he reviewed, it's not there. We, we argued that to the U.S. District Court, and he said, well, the judge said, well, that was after the fact, you know, that was an opinion after the fact. But so were all, so was Dr. Amato's opinion. I mean, any reviewer is going to be after the fact. So, it seems inconsistent to say the insurance company can have after the fact reviewers, but, but the claimant can't. But that was totally unfair of them to not give her, to not give those reviewers those records. And, and if you take those records, Dr. Wassily and Major Smith, the physical therapist, and Dr. Bardman, who also finds chronic pain, range of motion problems, and Dr. Wells, and Dr. Smith, everyone's consistent. The plaintiff's twin physicians are all consistent. She has had chronic pain problems and range of motion problems. And, and the only thing they have on their side is they had a worker's comp disability, IME that was done, which was aimed at whether or not her work caused her problems, which is totally irrelevant in the LTD claim. So, and then. The company was aware of her social security determination, was it not? Yes, but they, you know, they, they say what I, what we see over and over and over again, oh, those are just different criteria, so that, we're not going to consider that, which is what they did here. This Court has criticized that approach to say, you can't do that. Right. So that's why I'm trying to figure out what, your, your, your position is, A, there was the wrong standard applied in reviewing the decision, because the district court failed to factor in the, the, the conflict. Yes, Your Honor, and all the irregularities. And you go beyond that to say that she's entitled to benefits because the insurance company simply didn't take proper account of her evidence at all stages. Yeah, totally in order, and, and I think that's what they did, this Court did in Montour, and the Safon case is almost the same facts. Yeah, Safon and Montour are your principal. Yes, so I would reserve the rest for rebuttal. You have about two and a half minutes for rebuttal. Thank you. Your Honors, may it please the Court, my name is Mark Gerward, and I'm here on behalf of Apelli Disability Insurance Specialists. Co-Apelli HCA is presenting as well, and I believe they are taking two minutes of the time for argument. So I will try to limit myself to when the yellow light goes on. Your Honors, I think rather than work through my planned argument, I'm going to address some points directly both that Mr. Flanagan raised and also the questions the Court asked. With respect to the Safon and Montour cases, this case is, although on its surface has some similarities with those cases, it's a different and distinguishable case for several reasons. First of all, in Safon and Montour, the claims administrators in those cases had objective evidence in the record that supported a grant of disability benefits. But then told the claimant, there is no objective evidence in the record. So one of the concerns that this Court raised is that you can't hold a claimant accountable for not providing evidence where there is evidence that is being discounted or where it's the type of situation where objective evidence doesn't exist, such as evidence of pain, which is often subjective. In that regard, though, I think this Court's decision in the Jordan case is instructive. In that case, the Court noted that there may well be situations where there's evidence of things like pain, of a chronic pain condition, but the mere fact that there's evidence of a condition doesn't necessarily lead to the conclusion that the condition created a total disability as defined under a plan. And so in Jordan, you had a situation where there was subjective evidence of pain, where the plan administrator looked at the conflicting evidence. And what the Court said is that's exactly what an abuse of discretion standard is about, that the claims administrator weighs the conflicting evidence and having weighed that evidence makes a determination. And so long as it's a reasonable determination, that it's a supportable decision. In that case, there was both evidence that the pain had led to a disabling condition and that it had not. And the Court concluded that it was appropriate for the claims administrator to credit one set of evidence and give less credence to another set of evidence. The mere fact that you're not giving credence to all of the evidence that the claimant provides doesn't mean you have failed to consider it. With respect to the comments that were made about the consideration of evidence provided by the claimant here, the evidence she provided regarding her treatment after the waiting period, so the period during which she had to show that she was totally disabled, was in fact called out in DIS's response. What they asked their independent claims reviewer, their medical reviewer, to do though is look at her condition during the relevant time period, which is that period from February of 2000 to July of 2000. And so in the DIS response, they talk about that information, but the medical reviewer didn't review that information. And frankly, it wouldn't have been appropriate for him to do so, because the question, again, is not a year later when Dr. Waseel sees her, two years later when physical therapist Smith sees her, three years later when the Social Security Administration makes a determination that she is disabled as of that time, doesn't undermine the credibility of the evidence showing that during the waiting period, her condition, which there's no contest that she had conditions at the time, but simply that they didn't rise to the level of disabling conditions that prevented her from performing her own occupation. As to the evidence that actually relates to the relevant time period, Dr. Smith's, and this is distinguished from physical therapist Smith later on, but Dr. Stanley Smith, who was her treating physician, in his medical examinations shortly after the accident, which the claimant argues gave rise to her disability, he had significant skepticism about the conditions as she was reporting them. And then Dr. Hadley, who did a physical examination during the waiting period, noted both that same skepticism and, in fact, that the conditions, as he observed, were inconsistent with both the chiropractor Wells' findings and inconsistent with what the claimant was describing. So when formally being examined, she would show a greater limitation of motion than when informally observed. So those are precisely the kinds of facts that it's appropriate for the claims administrator to look at, and under an abuse of discretion standard, to weight the evidence and decide that there, I think as the district court suggested, there is evidence upon which reasonable minds could differ in this case. But there is a problem, though, in terms of the applicable standard of review, which Mr. Flanagan has brought to our attention, and that is where there is a structural conflict. The standard either rises to de novo, or at least there has to be an express finding by the trial judge that that was taken into consideration. Help us with that. What's your argument on that? Your Honor, I would respectfully disagree slightly with that statement in that I don't think a structural conflict necessarily leads to a de novo standard. What it leads to instead is an increased degree of skepticism. And then depending upon the presence of other facts in the record, the level of skepticism may rise. And I think in Glenn- Assuming that's true, point to the record where the Judge Burgess took that into consideration. And, Your Honor, both in the arguments below and in Judge Burgess's order, the issue was raised of whether there is a structural conflict here. The circumstance here is very different from the circumstance in a case like Glenn or Abbatee where the insurer is also the administrator. So the pocket out of which the money is coming belongs to the person who is making the decision. Here there was a delegation of authority to DIS from the insurer. And although Klayman argues that that delegation didn't take this out of the circumstances of a structural conflict, what they point to is the fact that Aetna retained the ability or reserved the ability to take claims back from DIS and IDR. So if they disagreed with the claim, they said, we will take back the liability for that claim. But not- If you're not deciding the claim, the kinds of claims the way we think they ought to be decided, we'll take them away from you. And I take it they got paid. What was the contractual relationship? You know, Your Honor, there was a lump sum payment at the beginning of the process. There was some, the amount of the lump sum varied to some degree based on claims that were in process at the point that the transfer was made or the delegation was made. But the record doesn't include any evidence that would suggest that DIS got some bonus for denying claims or- No, but there was some relationship between the number of claims that they handled and the amount that they got paid. It would appear. I don't believe that appears in the record. Wasn't there, isn't there in the record indications of email communication from, I lose track of which entity at which time. So I'll just say for the moment the insurers, I forgot whether it was Reliastar or Aetna or whoever came after Reliastar, but somebody in the insurer's side communicated with somebody in the claim administrator's side with regard to particular claims. Is there, is there evidence of that in the record? Your Honor, I'm not aware of that evidence in the record. Could I bring your attention to page 631 in which there is email exchange between Reliastar and Aetna and the passage says, how would you like us to proceed? Would Aetna like to take over the appeal handling or should DIS along with ING Reliastar complete the appeal review? If interested, you can review the appeal draft to the complaint. You can review the appeal response letter draft to the claimant. What do we make with that? Well, Your Honor, I think that's the provision in the claims agreement that I referred to before where Aetna has the right to take back liability for a claim. But at least it exposes structural conflict, does it not? Well, Your Honor, I respectfully disagree that it exposes structural conflict. It shows that DIS, as the administrator, is making Aetna aware of the fact that they are denying the claim and allowing them to exercise their right to take it back. Your response to Judge Clifton's question was that there was no evidence of communication. The citation just read to you by Judge O'Scann would indicate that there was communication and the tone of it is that this was not an isolated event. Your Honor, I was not aware of that citation in the record and I concede that there was communication. I also would argue that that does not show the type of structural conflict that was at issue in Glenn and Abbatee. And regardless of the fact when That last statement is not the same kind of conflict. If, in fact, you have the insurer directly speaking about a particular claim, how is it not exactly the same kind of conflict? Because it's the insurer whose pocket's affected and the insurer is here seeking to influence the claim handler. Well, Your Honor, I would argue that the insurer is not seeking to affect the claim handling. It's the claim handler is saying, pursuant to our agreement, do you want this one back? Well, the communication is from whom? The communication is from Elias Starr, which was, there was a delegation of authority from Aetna to Elias Starr and then a subsequent delegation of authority from Elias Starr to DIS. What I'm looking at is the communication by Miss, I think it's Miss Ware, who's the claim consultant for ING. I understood it was on the insurer's side. And Your Honor, ING is the corporate parent of Elias Starr, so. So, this is a communication by the insurer to, I thought, but again, I may have gotten lost on the names, to the claims handler. And indeed, the next page, 632, is another communication from Miss Ware to Taylor. Again, talking specifically about the Dianne LeSueur claim. The 633, I've requested that DIS for you a copy of the claim file for your review. So, it sure does look to me like the insurer is taking a direct hand in the review of the claim. Well, Your Honor, I would submit that it's not the insurer taking a direct hand. The insurer was Aetna. Aetna delegated their claims administration authority to Elias Starr, who in turn delegated to DIS. And that communication is saying, we have an agreement that you can take these back. Yeah, what agreement? That is between whom? And who's taking them back? It's an agreement between Aetna and Elias Starr. So, they have an agreement that under some circumstances, Aetna can take it back? Correct, Your Honor. So, they have to communicate as to whether or not that's happening? Correct, Your Honor. But it doesn't mean that DIS's decision is affected by the bottom line in the way that Aetna's decision might be affected. But in any event, Your Honors, the court did in fact assume for the sake of argument that there was a conflict here in its order. The court specifically stated, I will assume for the sake of argument that there's a structural conflict and view the record with a degree of skepticism based on that. But despite that degree of skepticism. It would help me if you could point to where in the order it says that. Certainly, Your Honor. It would be record 240, 4-0. Your Honor, it's on page 19 of the district court's opinion. It's the same page, it's 2-4-0. Or page 19 of the opinion, at the bottom of the paragraph that started on the page before. Correct, Your Honor. And the court makes reference there to, review would be enhanced by only a low level of skepticism. Because Lesore has provided no evidence of malice, self-dealing, or of a parsimonious claims granting history, is a phrase. And that's a quote which comes from, I believe, a baby. Would you characterize the evidence that the plaintiff talked about in his presentation with regard to the alleged failure of the lost in the games. The alleged failure to give to Dr. Amato the information from the Elmendorf evaluation of the claimant. Does that constitute evidence of a failure to, of malice or self-dealing? Your Honor, GIS would submit that it does not. That because the evidence relating to treatment long after the waiting period didn't relate to Ms. Lesore's condition during the waiting period. That it was entirely appropriate to instruct Dr. Amato to focus on her condition during that relevant time period. Rather than to look at records going forward years in the future. What did Dr. Amato look at? Well, from Dr. Amato's statement, it appears he looked both at the contemporaneous records. And that those contemporaneous records did include a submission from Mr. Wells, the chiropractor, which had been submitted with Ms. Lesore's appeal. So he did, in fact, look at some materials that came from the appeal process. But he also limited his review, it appears, to documents that reflect treatment, both leading up to and then during the waiting period. But did not look at materials that reflected treatment a year or two or three later. I forgot I have two minutes, so. Any debrief? Yeah, very brief, Your Honor. Good morning. My name is Matt Stevens. I represent HCA, Inc., and HCA, Inc., Long-Term Disability Plan, which together I will refer to as HCA. Based on the discussions today from counsel for DIS, and based on the briefs below, followed by DIS and HCA, we respectfully ask this court to affirm the lower court's decision dismissing with prejudice Ms. Lesore's complaint as to all parties. However, if the court does not dismiss with prejudice as against all parties, affirm as the lower court's decision. We ask the court do so with respect to HCA for two reasons. One, there's been no issue raised on appeal with regard to or suggesting that the district court erred in dismissing with prejudice the complaint against HCA. And therefore, that issue would be waived. And two, HCA cannot be held liable since HCA was not the fiduciary or discretion to determine the appellant's eligibility for long-term disability benefits, and thus neither participated in any aspect of the claims administration process, nor possessed any discretionary authority to interpret the terms of the plan. And therefore, as a matter of law, HCA cannot be held liable. And if Your Honor, if I may, I'd like to provide the court a case from the District of Alaska that actually holds that. All right. Do you have copies of it? I have copies for all accounts. May I approach? Just provide them to the clerk. Give it to them. Respectfully, we ask the court to affirm. Thank you. Thank you, Your Honor. Thank you. Dealing with them in reverse order, the reason that HCA is in this case is because this circuit has previously ruled insurance companies can't be. And so there's been a long-going problem about who is the proper party in these cases, and rather than filing... Plan administrators can be. Yeah, plan administrators. Is there any real reason to have HCA if you've got the administrator? No, they are the plan administrator under the plan. They're the ones listed as the plan administrator. HCA is the administrator? Yeah. The insurance companies make sure they are not listed as the plan administrator in any of the plans, knowing that they could be named. And so, you know, we normally list the plan administrator and the plan, in this case disability insurance specialists, but, you know, like I said, there's an ongoing question as to who is the proper party in these cases. Now, going to the other arguments, Dr. Amato didn't decide what he was going to review. He only was given what they wanted him to review. So the idea that I thought was put forward here that he decided to only review, that's not what the record shows. It shows that DIS only gave him what they wanted him to review. And I would point out one other thing. There were mental health records that were provided to DIS. Dr. Amato was not a psychologist or a psychiatrist. There are records, throughout the records, virtually everybody who reviewed them said that she was suffering from depression. The mental health people said she was disabled from this condition, and they never even had that reviewed, plus they didn't give it to Dr. Amato to review either. And so going back to what we said previously in this case, this was unfair claims handling in this case. It's almost identical to SAFON, and the idea that that case is distinguishable because in one they told her, you don't have any objective evidence when they did, that's putting the horse before the cart. Under Boutin, they have to tell the claimant what she's supposed to submit. They never did. She was left to guess what they wanted. And then not even know why they're making the decision because they wouldn't even give her the reviews. So thank you. All right. Thank you. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise.
judges: Schroeder, O'scannlain, Clifton